## CRANDALL and others *v.* RICHARDSON and others.

*(Circuit Court, S. D. New York.   February 23, 1881.)*

1. **REISSUE No. 4,223—CHILDREN'S CARRIAGES—NOVELTY—VALIDITY.**

   Reissued letters patent No. 4,223, granted January 3, 1871, to William E. Crandall, for children's carriages, *held void for want of novelty* as to *first*, and *anticipated* as to *second*, *third*, and *fifth* claims.

2. **SAME—SAME—ANTICIPATION.**

   Complainant's riding device, consisting of two profile frames representing horses, mounted on rockers, connected together with a seat, so as to allow the feet of the rider to extend downwardly between the frames, with a hinged toy-box in front of the seat, serving to hold the child in place and as a receptacle for its playthings, *held*, *anticipated* by the Brown devices—one consisting of side frames representing a horse, terminating in rockers below and connected together with a seat and foot-board, allowing the feet of the rider to extend downwardly between the frames, joined in front and rear by two vertical boards, one having extending from the front a profile horse-head, and from the rear a profile of a flying horse-tail; the other consisting of two solid frames representing an eagle or swan, continuous to and terminating in rockers below, with a seat connecting the frames together and a toy-box in front to keep the child from falling out.

3. **SAME—SAME—MODIFIED FORM.**

   Whether the frames are the profiles or outlines of horses or are solid, or whether they are in the form of horses, eagles, swans, or of any other bird or animal, is a matter purely of taste or design, and, so far as any mechanical effect or result is concerned, is of no importance.

4. **DEFENCE OF PRIOR USE—DOUBTFUL EVIDENCE—SUCCESS OF LATER DEVICE NOT CONCLUSIVE.**

   In a defence of prior use it is often a controlling circumstance, where there is doubt in the proof, that, considering the success of the later device, if it had been made previously it would have attracted the attention of the trade and immediately have gone into use; but it often happens that from various fortuitous circumstances a complete invention, in a branch of business where much depends on energy and facilities and capital, fails to attract that attention which, under different and better auspices, it receives when independently produced at a later day.

*P. Van Antwerp,* for plaintiffs.

*B. Wadleigh* and *Frederick P. Fish,* for defendants.

BLATCHFORD, C. J. This suit is brought on reissued letters patent No. 4,223, granted to William E. Crandall, January 3, 1871, for an "improvement in children's carriages;" the original patent, No. 100,- 121, having been granted to him, as inventor, February 22, 1870, and reissued to him, No. 3,972, May 17, 1870. The specification of No. 4,223, including what is outside of brackets and what is inside of brackets, and omitting what is in italics, reads as follows:

"Figure 1 is a side view of the device, illustrating my invention. Figure 2 is a central vertical longitudinal section thereof. Figure 3 is a top or plan view. Similar letters of reference indicate corresponding parts in the several figures. My invention consists in constructing the body of a child's carriage of two frames [representing horses in profile, each mounted on a rocker, and] *which are* connected together [by] *so as to form* a seat [and a foot-board] *between them. It also* [of] *consists in* a toy-box [arranged between the profile] *which is connected to the* frames, *and serves to keep the rider in the seat, but it may be readily moved over in order to release him when desired.* [And furthermore, it consists of a combination of parts, as will hereinafter more fully be set forth.] The body may be mounted on wheels or rockers, and thus form a carriage or rocking-horse at the pleasure of the child. In the drawings, A A [are] *may represent* two frames [representing] *which, in the present case, are made in the form of* horses, which are arranged parallel to each other, with their feet resting on a base, B, which, if desired, may be in the form of rockers of an ordinary rocking-horse. The [profile] frames are connected together by cross-pieces, [forming a seat,] C, *which, with the former, constitute a guarded seat, so that a child can easily ride without danger of being thrown or falling out. In order to render his position still more secure, there is connected to the frames in front of the seat a* [A] box, D, [is hinged in front of the seat, serving to hold the child in place, and forming] *which, in one position, hold the child in the seat, and likewise forms* a receptacle for *his* playthings, and [which can be turned over to let the child out] *in the other position allows the child to remove himself, or be removed, from the seat.* The base, B, and [the] frames respectively may be connected together by auxiliary cross-rods, bars, or braces, or otherwise, for strengthening purposes, and the child may rest his feet on a foot-board, E, which is secured to the base, B. To the base, B, there is connected, in any suitable manner, a series of wheels, F, whose bearings should be so constructed that the wheels may be swung or raised up or down, whereby the whole weight may rest either on the wheels or on the [rockers or] bed. When it is desired to employ the device as a carriage, the wheels are swung or moved downwards, and by means of suitable pins, G, or other retaining devices, the [rockers are] *bed is* cleared from the floor, and the carriage can then be [used] *drawn forward* as an ordinary child's carriage. When the wheels are raised or removed, then the bed should consist of rockers, so that the child can rock [itself] *himself* after the manner of a rocking-horse. Should the arms or shafts of the wheels

be immovable fixtures, the bed, E, may consist of a flat board or strip, and not be in the form of rockers; *It will·be perceived that the construction of the body, A C, not only produces a convenient and safe* [The frames, A A, representing horses in profile and then connecting] seat [form an attractive and amusing riding mechanism, and present] *for the child, but that* the appearance *is presented* of two [animals] *horses* which the child can [imaginarily] drive simultaneously, without straddling *either,* and thus [without danger of] *·be protected from* falling [out] *off.* Suitable harness may be placed on the horses, and the bridle extend within convenient reach of the child. *It is noticeable that the child can neither fall forward, backward, or sideward, and I thus produce an attractive, amusing, and safe riding medium."*

Reading, in the foregoing, what is outside of brackets and what is in italics, and omitting what is inside of brackets, we have the text of the original specification. The claims of No. 4,223, seven in number, are as follows:

"(1) A riding device, consisting of the profile frames, A A, connected together by a seat, so as to allow the feet of the rider to extend downwardly between the said frames, substantially as described. (2) Two profile frames terminating in rockers below, and connected together by a seat and a footboard. (3) The combination of a box, D, profile frames, A A, and a suitable seat, C C, substantially as described. (4) The profile frames, A A, seat, C, box, D, bed, B, rockers and wheels combined, and operating, in relation to each other, substantially as described. (5) A hinged toy-box arranged between two profile frames, substantially as described. (6) The wheels, F, arranged upon the rockers in front and rear, in combination with the two profile frames connected together by a seat, substantially as described. (7) A riding device, produced substantially as described, that is to say, that it can be converted into a carriage or rocking-horse, through the medium of rockers and wheels, the latter adapted to be raised or lowered, substantially as described."

The claims of the original patent were four in number, as follows:

"(1) The frame, A, connected together by a seat, C, forming the body of a riding device, and allowing the feet to project through it, when combined and operating substantially as described. (2) The box, D, connected to the frames, A, in combination with the seat, C, substantially as and for the purpose described. (3) The wheels, F, or rockers, B, in combination with body and seat, A, C, substantially as and for the purpose described. (4) The frames, A, seat, C, box, D, bed, B, and wheels, G, combined and operating together, substantially as described."

The claims of No. 4,223, which are alleged to have been infringed by the defendants, are claims 1, 2, 3, and 5. The "profile frames" are an element in each one of those four claims. These profile claims are shown, by the text of the specification, to be frames showing the profiles of horses and not profiles of anything else. The drawings of the original patent and of No. 4,223, which are the same, show profiles of horses. Under the original patent the claims were,

probably, not limited to the profiles of horses, but extended to any frames which answered the mechanical description of the frames described, without reference to the profiles of the frames. But the claims of No. 4,223 are more limited in respect to the frames, and require the frames to exhibit the profiles of horses, besides answering the mechanical descriptions of the frames described. The admission in the record, in connection with the testimony of Smith, who is shown by the record to have been first duly sworn, and what is alleged in the bill and not denied in the answer, shows sufficiently that the defendants, before the bill was sworn to or filed, made, used, and sold children's carriages containing the improvements covered by claims 1, 2, 3, and 5, of No. 4,223. The bill avers that fact. The answer does not distinctly deny it, but only denies that the defendants have done so to the injury of the plaintiffs, or in violation of their rights. The defence is want of novelty. In general terms, claim 1 is for profile frames and seat; claim 3, for profile frames, seat, and toy-box; claim 5, for profile frames and toy-box; claim 2, for profile frames, seat, foot-board, and rockers.

1. It is contended that Anden made, in 1861, a structure like Exhibit No. 3, containing the profile frames, seat, foot-board, and rockers, and which anticipated claims 1 and 2. No original structure then made is now produced. No. 3, now produced, was made in 1877, as an illustration, by John H. Brown, from a drawing received by him from the defendants' book-keeper, and at their request. This No. 3 is almost precisely like the plaintiffs' structure, minus the toy-box and the wheels. It was reproduced after full acquaintance with the plaintiff's structure. It was not made by Anden. After it was made it was produced on Anden's examination, and was then shown to him before he was asked to describe what he had made in 1861. Anden says that he made a number of these structures in the winter of 1861, while he was working for a Mr. Christian, in New York. Soon after that he ceased to work for Christian. He says he afterwards made some of the structures and had them on sale at a place of his in Madison street, and sold a few, but found they would not take; that after that he went back to Christian's, and, before doing so, gave away three or four of them and burned the rest; that he left Christian's again, last working for him in 1867, and was employed by Elder & Brown for over three years, and at the same time kept a toy store in Chatham street for over two years, of the years 1868, 1869, and 1870 and sold some of these structures at that place; that he has not seen any of them since he left Chatham street, in 1871 or 1872, and has

made none since; that those he had left, from four to six, he gave to his landlord for rent, and that they were slow-selling things. Being asked the names of any persons in his employ when he made the articles in Madison street, he gives the names of Charles Guessnar and Richard Harding. Harding was called by the plaintiffs. He was a cartman, and knew Anden in Madison street as a painter, but did no work for him save carting a load of furniture. Anden states, as a means of fixing the date when he first made these structures, that he was at the same time painting what was called the Boston rocker, belonging to Palmer Brothers, and that he has a memorandum showing the receipt and delivery of Boston rockers, dated between December 7 and 10, 1861. He gives no description of what he calls the Boston rocker, nor does he state anything to show what it was, except when asked if it had a "toy-box." He says it had "to secure the head in the single-headed rocker." This is all very confused. The defendants claim that there is other evidence to show what this Boston rocker was, and that it was made about 1861, and to no great extent afterwards. Rich testifies that he sold at Boston, from 1859 to 1861, a rocking-horse and cradle combined, made under patent No. 23,003, granted to Arad Woodworth, 3d, and others, February 15, 1859; but he says that it was not, to his knowledge, called the "Boston rocker." Goodrich testifies to the same rocker as Rich, as sold in Boston in 1860, and says that it was known in the trade generally by the name of the "Boston rocker;" that the last he sold was in 1869, and that they were not made after that to his own knowledge. Tibbals testified that an article called the "Boston rocker" appeared in New York about 1862; that the nearest thing to it is Exhibit 4, which is a rocker with a seat in a box, and a horse's head in the middle in front; that he has not seen one since 1869, and that it had a short run of about two years. The Woodworth rocker is one with a seat in a box, and a horse's head in the middle in front. On the whole, it must be accepted that the Boston rocker referred to by Anden was the Woodworth rocker.

John H. Brown, of the firm of Elder & Brown, for whom Anden worked as above stated, testifies that Anden was their foreman painter for several years, including 1868; that he sold to Anden toys, and hobby-horses, and rocking devices in November, 1868, to be sold in his trade, he being engaged in business in Chatham street, and Bethune, and Washington; that Anden, during the time he worked for him, told him about his manufacturing hobby-horses, "Shoo-flys and Dexters;" that Anden called such hobby-horses and

rocking devices "a new line of toy he had introduced;" that between November, 1868, and Christmas, 1868, he saw, in Anden's paint-room, parts of a profile horse, not complete, and that what he so saw was "the sides, substantially the same as Exhibit 3." Brown also says that he assisted Anden to go into business, by letting him have $148 worth of goods, and took the responsibility on his own shoulders. Anden was examined as a witness for the defendants on September 22, 1877, and gave the testimony before recited. On the same day Brown was examined as a witness for the defendants. On his direct examination, at that time, he was not asked anything as to Anden, although Anden had just testified as to his being with Elder & Brown for over three years, and as to his selling his structures at his toy store in Chatham street at the same time that he was working for Elder & Brown. On his cross-examination, on September 22, 1877, Brown was asked:

"Cross-Q. 58. Do you know John Anden, the previous witness, and how long have you known him? A. I know him; I can go back as far as 1868, when I sold him goods. Cross-Q. 59. What was he engaged in then? A. Foreman painter for Elder & Brown, my firm at that time. Cross-Q. 60. Did you ever see any rocking-horses made by him; and, if so, when first? A. I did not."

This last question and answer, standing alone, would be under-stood as meaning that the witness had never seen any rocking-horse which Anden had previously made, and not that he had never seen Anden go through the process of making a rocking-horse. The above was all that Brown was then asked by either side about Anden. Brown's testimony stood thus for more than two years, and until October 2, 1879, when he was called as a witness for the plaintiffs, and gave, partly on direct examination and partly on cross-examina-tion, the other testimony before recited as given by him. The defendants urge that Brown, having a pecuniary interest in Anden's venture, had every reason to examine and notice his stock.

Road, a driver, says he knew Anden while Anden had a store in Chatham square, and went into his store with and for goods gener-ally about twice a week,—first in 1869, in the fall, and last about 1870, in the spring,—and never saw there a rocking device, with pro-file frames, resembling the plaintiff's structure. His testimony amounts to very little. The time he speaks of is more than a year later than the time spoken of by Brown, and he does not seem to have had any opportunity or occasion to see all that Anden had, or to visit all the rooms in his shop.

Anden is attempted to be contradicted on a collateral matter, with a view of showing that he is not a truthful witness. In giving his testimony in September, 1877, he says that when he went to work for Christian the second time "various articles, profile sides, representing horses, birds, etc., came continually to the shop to be repaired and painted from stores Mr. Christian dealt with." He does not state where the shop was to which he refers. McGill, who was with Christian as a wood-worker and superintendent from 1857 to 1872, and who knew Anden there as a painter, says that while Anden was employed there, there were not, to his knowledge, "Shoo-flys, Dexters, or anything like Exhibit 11," brought there for repairs. Anden's identification of the articles he refers to as "profile sides, representing horses, birds," etc., is very vague and indefinite. It does not appear that he refers to the same things McGill does, so no contradiction is made out.

In regard to other contradictions of Anden by McGill, it appears that Christian had a factory up town and a wareroom down town; that McGill worked at the factory, and that Anden worked at the wareroom. The plaintiff contends, and very forcibly, that from the history of the success of the plaintiff's structure any device made by Anden like No. 3 would at once have attracted the attention of the trade and have gone into use. This is often a controlling circumstance in a case of doubt. But it often happens that, from various fortuitous circumstances, a complete invention in a branch of business, where much depends on energy and facilities and capital, fails to attract that attention which, under different and better auspices, it receives when independently produced at a later day. On the whole, it must be held that Anden's structure is established as anticipating claims 1 and 2.

No. 3 has no toy-box. Anden says, in speaking of his structures like No. 3:

"I found it necessary to fix something in front, so that a small child wouldn't fall forward in front, out of it. So I fixed them in various ways— some with a little board or tray, or an angular box; that is, made at an angle to fasten in, with the rod through to swing."

This is very vague, and does not show the hinged toy-box of the plaintiffs to be turned over to let the child out. Elsewhere, he says that the toy-box was fixed between the horses' necks so as to secure the child in its seat. He says that a few on larger-sized horses were nailed in; that others slipped in when the child took its seat, through cleats; and that others he had swing on a rod that went through the

horses' neck, "for amusement to the child, as that style of tray, made that way, held the most things that amused the child." This is too vague to show the plaintiffs' structure. It was easy to say that the box was arranged as in the plaintiffs' structure, if the fact were so.

2. The making of a structure like Exhibit No. 4, by John H. Brown, before the invention of Crandall, is satisfactorily proved. It has two side frames, terminating in rockers below, and connected together by a seat and a foot-board, the arrangement being such as to allow the feet of the rider to extend downwardly between the frames. In the front and the rear the space across is walled in by two vertical boards, one in the front and one in the rear, while in the plaintiffs' patent the spaces are open. The side frames are of one piece, solid to the edges of the rockers, while in the plaintiffs' structure the space across under the bodies of the horses is open. In the middle, of the width of a horizontal cross-board, which extends rearward from the top of the front vertical cross-piece, the profile head of a horse stands up vertically; and from the middle, of the width of a back-board, to the seat, projects rearward a profile of the flying tail of a horse. The structure contains all the elements of claims 1 and 2 in which there is any patentable invention. The frames do not represent horses in profile, and the structure represents the appearance of but one horse. There is a provision for a bridle, and a child can, imaginarily, drive the one horse without straddling it, and without danger of falling out. The child can rest its feet on the foot-board, and can rock itself after the manner of a rocking-horse. Whether the frames are the profiles or the outlines of horses, or are solid frames, is a matter purely of taste or design, and, so far as any mechanical effect or result in the combination is concerned, is of no importance. So, putting a horse's head on each frame, or otherwise making the structure present to the eye, or to the mind of the child, the appearance of two horses instead of one, is no mechanical invention, the other parts of the combination being the same, any more than it would be to add the appearance of one more, or two more, horses in front, in any form of arrangement.

3. No. 5 shows two frames terminating in rockers below, and connected together by a seat with a foot-board, and the feet of the rider can extend downwardly between the frames. The frames are solid and continuous to the edges of the rockers, and each presents the appearance of the body of an eagle, with its head in the center of the length of the frame, the beak pointing forwards, the front and rear

parts of the frame being so painted as to represent the outstretched wings of the eagle, the legs and claws of the eagle coming out below, and there being on its breast a shield with stars and stripes. Mechanically, this structure contains all that there is in claims 1 and 2 of the plaintiff's reissue, although it contains no idea of a horse. But, whether the side frame be in the form of a horse or of an eagle, or of another bird or animal, is a mere matter of design, and has nothing to do with any mechanical element or combination found in either of those claims. It is shown that Brown made half a dozen structures like No. 5, and sold one before Crandall's invention; that he also made half a dozen others, like No. 5, before Crandall's invention, except that they had representations of swans instead of eagles; and that the eagles were some of them shipped and some put in the show-room; and the swans were put in the show-room. The evidence is also satisfactory that the structure, like No. 5, had a hinged toy-box in front of the seat, serving to hold the child in place and forming a receptacle for playthings. It could be turned over to let the child out, and did not differ from that in the plaintiff's reissue. Tibbals does not remember the toy-box, but it is sufficiently proved by Brown, Cowry, and Allen. Claims 3 and 5 are, therefore, anticipated by the structures like No. 5.

I deem it unnecessary to consider any of the other structures, or any of the prior patents set up in defence, as, on those above considered, the bill must be dismissed, with costs.